IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CAMILLE MAE KRAMER,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>WASATCH COUNTY and KENNETH VAN WAGONER,<br><br>Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:08-CV-475-TC |

Plaintiff Camille Mae Kramer asserts sex discrimination claims against her former employer Wasatch County[1] and former Wasatch County Sheriff Kenneth Van Wagoner.[2]  She alleges that when she was employed as a bailiff at the Wasatch County courthouse she was sexually assaulted, harassed, and threatened on multiple occasions by her immediate supervisor Sergeant Rick Benson, who subjected her to *quid pro quo* harassment and a hostile work environment.  She further alleges that she was the victim of a hostile work environment perpetuated by Wasatch County's and Sheriff Van Wagoner's failure to adequately respond to Sergeant Benson's sexual harassment and other co-workers' harassing behavior in the workplace.  She brings her claims against Wasatch County under Title VII of the Civil Rights Act of 1964

---

[1]Although the complaint also names the Wasatch County Sheriff's Office as a defendant, the parties have stipulated that the proper defendant in this case is Wasatch County.  (See Mar. 31, 2011 Order & Mem. Decision at 1 n.1 (Docket No. 59).)

[2]Ms. Kramer's claims against Sheriff Van Wagoner's co-defendant Brian Gardner have been dismissed. (See Dec. 8, 2011 Order (Docket No. 74) at ¶ 3.)

and 42 U.S.C. § 1983, and against Sheriff Van Wagoner under § 1983.[3]

The Defendants filed a motion for summary judgment, which the court originally denied in its March 31, 2011 Order and Memorandum Decision (Docket No. 59).  In the March 2011 Order, the court held that genuine disputes of material fact precluded summary judgment on Ms. Kramer's Title VII claims.  (Id. at 2.)  The court also dismissed Ms. Kramer's § 1983 claims on the basis that such claims were not adequately pled.  (See id. at 2 n.2.)  But now, upon re-examination of the issues and factual record (after supplemental briefing and hearings),[4] the court reconsiders and reverses its decision in the March 2011 Order.

For the reasons set forth below, the court holds that: (1) Wasatch County is not directly liable under Title VII for the actions of Rick Benson or Sheriff Van Wagoner; (2) Wasatch County has established the Ellerth/Faragher affirmative defense to Ms. Kramer's Title VII vicarious liability claims; (3) Sheriff Van Wagoner is entitled to qualified immunity under § 1983; and (4) Wasatch County is not liable as a matter of law under § 1983 because there is no evidence of any custom, practice, or policy that created or supported the hostile work environment alleged by Ms. Kramer.  Accordingly, Wasatch County and Sheriff Van Wagoner are entitled to summary judgment on all of Ms. Kramer's remaining claims.

---

[3]Ms. Kramer's Title VII retaliation claims are no longer before the court because she voluntarily dismissed them.  (See Dec. 8, 2011 Order (Docket No. 74).)

[4]The court's re-examination was prompted in part by Plaintiff's Request For Clarification of the March 31, 2011 Order and Request to rule on all issues raised in the Defendants' Motion for Summary Judgment (Docket No. 62).  Based on the Plaintiff's request, and after review of the parties' briefs (Docket Nos. 62, 64, 66) and a December 7, 2011 hearing, the court struck footnote two of the March 2011 Order and opened all of the issues for reconsideration.  (See Dec. 8, 2011 Order (Docket No. 74) at ¶ 1; Jan. 19, 2012 Minute Entry (Docket No. 78).)  The court also received supplemental briefs before holding its January 19, 2012 hearing.  (See Docket Nos. 76-77.)

**FACTUAL BACKGROUND**

Former Wasatch County employee Camille Kramer alleges (with no dispute from the Defendants for purposes of the summary judgment analysis) that former Wasatch County employee Sergeant Richard "Rick" Benson made a series of unwanted sexual advances toward Ms. Kramer, including rape.  Sergeant Benson's actions are the foundation and catalyst for her Title VII sexual harassment and § 1983 claims against Wasatch County and Sheriff Van Wagoner.

**Employees and Supervisors at Wasatch County**

Plaintiff Camille Mae Kramer was a Wasatch County employee from July 2005 to July 2007.  At the relevant times, Defendant Kenneth Van Wagoner was the Sheriff of Wasatch County, and, consequently, the department head of the Wasatch County Sheriff's Office.

Ms. Kramer was a POST-certified[5] officer working toward the goal of becoming a police officer who worked "on the road."  Initially, Ms. Kramer worked as a jailer in the Wasatch County Jail.  In the summer of 2006, she was promoted to the position of deputy bailiff at the Wasatch County Court.  It was Ms. Kramer's understanding that working as a bailiff would provide opportunities for "road experience and serving warrants," which would allow her to get experience necessary to become a police officer.  (Kramer Dep. at 12.)

Ms. Kramer was one of three bailiffs at the courthouse.  Besides Ms. Kramer, Deputy Brad Hulse and Sergeant Benson worked as bailiffs.  Ms. Kramer was the least senior of the three.  Brad Hulse was a deputy bailiff who had some seniority over Ms. Kramer.  Their

---

[5]POST, which stands for Peace Office Standards and Training, is the required certification for law enforcement officers in Utah.

immediate supervisor was Sergeant Benson. The bailiffs, under Sergeant Benson's direction, were in charge of security at the courthouse, including maintaining a security presence in the courtrooms, managing the magnetometer at the courthouse's secure entrance, and transporting prisoners to and from the courthouse for hearings.

Sergeant Benson's job duties included managing the other two bailiffs, scheduling, delegating tasks such as monitoring the magnetometer, transporting and managing prisoners in court, and serving warrants. Because he was in charge of scheduling and ensuring that court coverage was complete at all times, he had limited control over when Ms. Kramer could take vacation time or leave her shift to attend to personal business such as doctor appointments and family matters. He also wrote her performance evaluations, which were submitted to Captain Rogers and then to Sheriff Van Wagoner for review. He did not have authority to affect the material conditions of Ms. Kramer's job, such as pay or benefits. Only Sheriff Van Wagoner had the authority to hire, fire, promote, and demote employees. Sergeant Benson, however, had authority to make a recommendation to the Sheriff about demoting, promoting, or firing Ms. Kramer.

**Sergeant Benson's Alleged "History"**

According to Ms. Kramer, before Sheriff Van Wagoner placed her under Sergeant Benson's supervision, Sheriff Van Wagoner "had notice of [Sergeant] Benson's history of harassment and intimidation of female co-workers and a history of disregard for rules." (Pl.'s Mem. Supp. 1983 Causes of Action (Docket No. 57) at 7.) She then lists Sergeant Benson's alleged history, which includes "unlawfully 'fixing a ticket' for his friend, intimidating, threatening, and harassing female employees, unlawfully taking police vehicles outside of the

county for personal reasons, violating a court order to stay out of the courtroom, . . . [and] sexually inappropriate behavior toward two female confidential informants (CIs) of the department when he worked narcotics[.]"  (Id. at 7 (internal citations omitted).)  The incidents of the "ticket fixing," the improper use of a Wasatch County vehicle, and alleged sexual misconduct with two female confidential informants apparently occurred before Ms. Kramer was placed under Sergeant Benson's supervision.  The other two incidents — "intimidating, threatening, and harassing female employees" and "violating a court order to stay out of the courtroom" occurred during the time Sergeant Benson sexually harassed Ms. Kramer.

The "ticket fixing" and improper use of a County vehicle are not gender based (Ms. Kramer refers to these incidents as evidence of Sergeant Benson's "disregard for the rules") and would not have put the County on notice of any propensity for sexual misconduct.

The incident of a "violati[on] of a court order" is overstated and cannot reasonably be inferred to constitute sexual misconduct.  First, the order was not a "court order" but an internal order to Sergeant Benson by the Sheriff (based on a letter from Judge McCotter) to stay out of the courtroom while an investigation into missing court funds was pending (Sergeant Benson, Ms. Kramer, and other courthouse employees were suspects).  The order was based on the intimidation and harassment of courtroom employees—including Ms. Kramer and two of the Judge's female employees—during the investigation.  The extent of Sergeant Benson's actions was to sit in the courtroom "glaring" at the employees.  (See June 13, 2007 Mem. from Justice Court Judge Lane McCotter to Sheriff Van Wagoner (Ex. 16 to Van Wagoner Dep); see also June 5, 2007 Mem. from McCotter to Van Wagoner noting that Sergeant Benson's conduct was "disconcerting" to the judge as well).)  While this behavior made the employees uncomfortable

and caused disruption in Judge McCotter's courtroom, nothing in the record suggests it was gender-based or sexual, much less that Sheriff Van Wagoner believed it to be so.

The allegation that Sergeant Benson sexually harassed two female confidential informants, and that Sheriff Van Wagoner knew of the alleged harassment, has no support in the record other than inadmissible hearsay. The court has reviewed the deposition testimony, briefs, and attached exhibits. Of all the places in the deposition testimony where the allegation of misconduct with confidential informants was raised, none constituted admissible evidence that such allegations were true. Wasatch County Sheriff's Office Deputy Jeffrey M. Winterton had no knowledge of the allegation ("Q: . . . . Do you remember a comment being made that Benson may have been sexually active with two CIs when he worked narcotics? A: I do not recall that comment."). (Winterton Dep. at 16.) Then-Chief Deputy Todd Bonner (second-in-command under Sheriff Van Wagoner) said he heard allegations of misconduct (he did not know if it was sexual misconduct), but he had no further information. (Bonner Dep. at 9-11.) Sheriff Van Wagoner testified that he never received any report regarding possible misconduct, sexual or otherwise, by Sergeant Benson with two confidential informants. (Van Wagoner Dep. at 24.) To support Ms. Kramer's allegation that Sergeant Benson had engaged in sexual misconduct with two confidential informants, Ms. Kramer relies solely on two sources: Chief Deputy Todd Bonner's deposition and an investigation report, both of which only contain inadmissible hearsay on the topic.

In her opposition brief, Ms. Kramer cites to a state investigator's report (Exhibit 23 attached to Sheriff Van Wagoner's Deposition) and Todd Bonner's deposition testimony, which, as described above, is inconclusive and offers only allegations and inadmissible hearsay. (See

Mem. Opp'n Mot. Summ. J. (Docket No. 49) at xv (citing investigator's report), 12 (citing

investigator's report and Bonner Dep.); Pl.'s Mem. Supp. 1983 Causes of Action (Docket No.

57) at iii ¶ 9 (citing investigator's report).)  The investigation report contains the following:  "On

Thursday, July 26, 2007, I [Agent Fleet] met with Lt. Winterton, Brian Gardner, Stan Olsen, Rob

Jack, the sheriff, the chief deputy, the county manager, and the county attorney, Thomas

Lowe. . . .   They said that there was an <u>allegation</u> that Rick <u>may have been</u> sexually active with

two CIs when he worked narcotics.  They told us that Utah County Major Crimes may have

records of who these CIs were. . . .").  (Agent Fleet's Investigation Report (Ex. 23 to Van

Wagoner Dep.) at pp. 3-4, ¶ 8 (emphasis added).)  Agent Fleet's written statement about

allegations is inadmissible hearsay.  And Ms. Kramer does not cite to anything else of substance

in her briefs.

**<u>Wasatch County's Policy Against Sexual Harassment</u>**

Wasatch County's policy against sexual harassment is set forth in the Wasatch County

Personnel Policy and was in place when Ms. Kramer was an employee.  The policy states that

"employees and job applicants are entitled to a work place or recruitment process that is free

from sexual harassment," and it defines "sexual harassment" as "unwanted conduct or

communication of a sexual nature which adversely affects a person's employment relationship or

working environment."  (Ex. 1 to Kramer Dep. at Section XII.D.)  The policy lists a procedure

for "seeking a remedy which is comfortable."  (<u>Id.</u> at Section XII.D.2.)  That is, employees may

file a complaint with a department head, a personnel officer, or the Board of County

Commissioners, or may follow "established grievance procedures."  (<u>Id.</u>)

Ms. Kramer testified that she was aware of and understood the sexual harassment policy

when she was working for Wasatch County.  (See Kramer Dep. at 27, 39-42.)  She also testified

that she recalled the County holding sexual harassment training sessions at least once a year.  (Id.

at 41.)  And she understood the "department head" to be Sheriff Van Wagoner.  (Id. at 42.)  She

contends, however, that the policy was not enforced and the training sessions were inadequate.

The basis for her contention is discussed below.

**Harassment at the Jail and by Sergeant Benson at the Courthouse**

Ms. Kramer began working for Wasatch County as an employee in the jail.  During that

time, she and female co-workers experienced events that she characterizes as a hostile work

environment.  After a year working in the jail, she was promoted to deputy bailiff and worked in

that position for a year.  According to Ms. Kramer, during that two-year period she was harassed

numerous times in both settings by a variety of people, most notably Sergeant Rick Benson.[6]

**Comments by Jail Employees**

When she worked as a jailer, male employees in the jail would make comments about the

size of her breasts.  "They [at least two named male employees at the jail] used to talk about the

girls in the jail, specifically me because I had larger breasts than the other females.  They used to

make comments like, 'How are you going to fit those in your shirt, in your uniform?  If you go on

the road, you won't be able to wear a bulletproof vest because you can't fit them in there.'  And

they would make comments about a lot of the females in the jail's breasts."  (Kramer Dep. at 36-

37.)

---

[6]Ms. Kramer cites to a time when a female co-worker's car was vandalized and Sergeant
Benson was suspected.  But nothing in the record supports the conclusion that Sergeant Benson
was involved in any way.  Ms. Kramer relies on speculation, and so the court does not consider
that incident.

When Ms. Kramer was asked whether she brought the comments to the attention of anyone, she said "no."  She explained:

> We could go back as far as when I was in the police academy.  I was told in the police academy things like that happen.  You deal with it, you move on, or you'll never become part of the brotherhood.  You'll never be one of them.  You'll never be an officer, especially for the females.  You have to just take it.  You have to let it roll off your back.  You have to take a lot of comments.  Don't you ever, ever report it.  Because if you report it, you won't get backup, you won't get promoted.  You'll basically be nothing and nobody will back you up.  I mean, they told me that from the academy, you don't ever report that.  You just let stuff like that just roll off your back.  Just get over it, don't report it, just move on.  Be part of the department.

(Id. at 37 (emphasis added).)  In response to the question whether anyone from Wasatch County told her that, she generalized and said, "A lot of the guys in the jail, that was our conversations a lot of times.  'You're pretty cool, Kramer.  It's cool that you can just, like, let that roll off your back.'" (Id. at 38.)

In her briefs, Ms. Kramer contends that the Sheriff's department had an "unwritten policy . . . that if an employee complained about the sexual harassment, that employee would be punished through a lack of promotions, bad schedules, and ostracism from the rest of the employees  of the department." (Pl.'s Opp'n Mem. at ii.)  She asserts that she "was told by a female senior jail officer that females working for the Sheriff's department were expected to have thick skin regarding sexual harassment from their male co-workers."  (Id.)  But her deposition testimony, as quoted above, does not support her contention that the warning originated from anyone in the Sheriff's office.  Instead, Ms. Kramer says it was a protective mechanism she originally learned in police academy.

9

**"Babe of the Day" Screen Saver**

When Ms. Kramer was working in the jail, Sheriff Van Wagoner received complaints from Rae Davis, Camille Kramer, Kim Butler, and Shylah Richins, among others, about a "babe of the day" screen saver on a computer in the jail.  When Sheriff Van Wagoner and Todd Bonner, the Sheriff's second-in-command, received the complaints, they told the employee (someone other than Sergeant Benson) to remove the image because the screen display was inappropriate for the workplace.  (See Van Wagoner Dep. at 12.)  Sheriff Van Wagoner placed a written reprimand in the employee's file.  They told the employee that if it happened again, he would be fired.  The display stopped.

**Internet Pornography on a County Computer**

A female employee also reported that a male officer in the jail was watching pornography on the Internet.  When that incident was reported to the Sheriff by a female employee, Sheriff Van Wagoner investigated, confirmed that the incident had occurred, and immediately terminated the individual who had viewed the pornography on his work computer.

**Harassment by Jail Employees After Promotion To Bailiff**

After a year of working in the jail, Ms. Kramer was promoted to deputy bailiff at the courthouse.  But Ms. Kramer still had to go into the jail because she retained her jail commissary duties.  She contends that when she was there, she was confronted by various jail employees.  According to Ms. Kramer, "[t]here was a lot of jealousy from the people that had been here longer or had been in the jail longer, but they didn't have the certification.  And so a lot of just nitpicky things were going on. . . ."  (Kramer Dep. at 17.)  She described how jail employees would happily bring trays of lunch or dinner to the other bailiffs but never to her.  She said the

harassment came from "everybody in the jail or whoever was on shift and had the responsibility of ordering the trays that day." (Id. at 18.)  This included male employees as well as Cally Anderson, a female jail employee, who "was jealous, very jealous, right from the beginning, right from when I was hired, because she wanted to be on the road and she wasn't." (Id. at 21.)  "I felt that they were making it very hard for me to do my job in the commissary.  They were basically making remarks like, 'You don't belong back here.'  'You shouldn't be back here.'  'You should only be here if you're doing commissary.'  'Why can't you do the computer work out here?' . . . It was just basically you're not wanted back here, we don't want you back here, don't be back here." (Id. at 19-20.)  When asked whether she felt the animosity was directed at her because she was female or because she was promoted before the other longer-standing employees, she said, "I believed it to be both.  But, mainly, because I was the newbie.  I was the new one, newer than a lot of people who had been there longer, who had been in the jail longer." (Id. at 20 (emphasis added).)  This occurred in the spring of 2006, and at that point she went to Sheriff Van Wagoner to complain about the harassment.

**Reporting to Sheriff Van Wagoner**

<u>Ms. Kramer's Report and the Sexual Harassment Meeting</u>

Ms. Kramer said that she was "[f]airly comfortable speaking with" Sheriff Van Wagoner. (Kramer Dep. at 16.)  But she qualified that statement:  "I felt I could discuss things with him, yes.  But I didn't feel like - - I felt more like it was a discussion and not necessarily action." (Id.) Then she elaborated when asked whether there were things she spoke to Sheriff Van Wagoner that did not get resolved. "[T]here [were] some harassment things going on in the jail that I had discussed with him." (Id. at 17.)

11

When Ms. Kramer complained to the Sheriff in the spring of 2006, she said,

> I just [told] him, basically, I want to make the situation better, I want to clear the air, clear the tension, figure something out.  At this time I had already stopped taking lunch completely.  I had told them, "You know what?  Don't bother.  I don't ever want a tray.  I'm good.  I'll just find something else.  I'll bring something from home."  You know, don't worry about it, don't worry about ordering me a tray, basically.  And so I had cleared that up.  They had given commissary to somebody else, so I was no longer in charge of commissary.  But there was still a lot of bantering, "What do you need?  Hurry and get your stuff and get out of here.  We don't want you back here."  And I said, "I need to know what I need to do so that I can perform my job and be safe and they can be safe and we can just have a working relationship."  That's what I said to [Sheriff Van Wagoner]. . . .  The sheriff agreed that it was harassment and that it needed to stop.

(Id. at 21-22.)

What is not clear is whether she also complained about harassment that was based on gender or inappropriate sexual behavior or comments.  She does say that Sheriff Van Wagoner's response to her complaint was to hold a "sexual harassment class," where she said she was humiliated by Sheriff Van Wagoner, who re-enacted the very situations of which she had complained to the Sheriff.  (Kramer Dep. at 22.)  Her description of the meeting is vague concerning the topics discussed and the events re-enacted:

> He scheduled the meeting.  I wasn't aware of what the meeting was supposed to be about. . . . We go into the meeting.  Everybody at the jail and the bailiffs are there, and possibly a couple of road deputies.  We were in the meeting and he said, "I need a volunteer."  Nobody is volunteering.  I'm like, I'll do whatever.  I'll help you."  He goes, "Okay.  Stand up here."
>
> We stood up and basically he did the scenarios that I had given him previously in our one-on-one conversation.  He gave those exact scenarios, and then basically he's like, "That's harassment.  Don't do it.  It won't be tolerated."  Everybody knew it was directed . . . It was pretty much word for word what I had told the sheriff.  And I'm standing there in front of everybody who I had a problem with. . . .
>
> After the scenario that was almost word for word, he said, "Go ahead and sit

12

down," and he talked about sexual harassment and name calling and things, yes.

(Id. at 23.)

Sheriff Van Wagoner's deposition testimony sheds some light on the content of the meeting. After the screen-saver incident, the Sheriff called a staff meeting where he discussed sexual harassment, using example of things that could be construed as sexual harassment by one person but that might not be considered sexual harassment by another person. (See Van Wagoner Dep. at 13 ("it's how it's perceived [by] the other person").) He explained:

> I could say to you, you look nice, or, that's a nice dress, or something. You could take that and perceive it as being that I am making a sexual advance. That was one of the examples I used. Another one was the mere fact of taking your eyes and looking from the floor to the, from their feet to their head, can be perceived as sexual harassment. Making comments can be there. And what I done in that particular situation is, I said, okay, and I asked for volunteers. I don't even remember who for sure, who the volunteer was. But I said, okay, if this person is standing here and I look from the top of her head to her feet and back up, that can be construed as sexual harassment.

(Id. at 44-45.)

Ms. Kramer did not complain to the Sheriff that she felt the way the meeting was conducted was inappropriate. She said the harassment at the jail continued. After again complaining, "I was basically told not to go back there. . . .   Rick Benson told me that under the direction of the sheriff that unless I absolutely had to go back there because there was nobody else to go back and get inmates, just to stay out of the jail." (Kramer Dep. at 24.)

Shylah Richins' Alleged Report

Ms. Kramer contends that the woman who reported the "babe of the day" and pornography events, Shylah Richins, quit her job based on the alleged hostile work environment at the jail which intensified after she reported the harassment. For example, when she asked the

13

male employees displaying the "babe of the day" screen image, "they would harass her quite a bit." (Kramer Dep. at 36.) Ms. Kramer cites to Ms. Richins' experience as an example of how a complaint would not change anything other than to make the harassment worse. She contends that while she was working at Wasatch County, "she witnessed a fellow female employee [Ms. Richins] who was harassed to the point that 'she quit because things got more intense,' which [Ms. Kramer] believes was a result of taking a letter of complaint to the Sheriff." (Pl.'s Mar. 27, 2011 Mem. Supp. 1983 Causes of Action (Docket No. 57) at 6.)

But Ms. Kramer's deposition testimony establishes that she had no personal knowledge of the reason why Ms. Richins quit or that Ms. Richins actually complained to the Sheriff through a letter or other communication:

> A.      . . . [I]t was my understanding [Shylah] went to the sheriff and she reported the sexual harassment and the girl of the day being looked up on the Internet. Mark Ahlberg, Sergeant Mark Ahlberg, was then placed on the road, which in the majority of people's eyes was a promotion. So instead of handling it or making us fee like, 'Okay, that was good,' [the Sheriff] just took [the harasser] out of the jail and promoted him back to the road.

> Q.      And how do you know about Shylah's complaints. Were you there to see them?

> A.      No. I was shown a letter that she had written to the sheriff. Tammy Thacker showed me a letter that she had written to the sheriff.

> Q.      Do you have a copy of the letter?

> A.      No. [Tammy Thacker] showed me the letter. . . . And she said, "I can't believe that she's turning this in. We're all going to suffer because she can't just handle it. She can't get thicker skin." Later on Shylah ended up quitting. She actually quit before Mark Ahlberg was placed on the road.
> . . .
> I don't know if [Shylah] took [the letter] to the Sheriff. I believe that she did because after that things got worse for her.
> . . .

14

> Q.      Do you know why Shylah quit?  Did you ever speak to her about it?
>
> A.      No.  I never spoke to her.  She quit.  And then shortly after that Mark Ahlberg was put on the road, promoted to the road position.  That's how I perceived things to go. . . .
>
> Q.      And I understand that's your perception. . . .  But you would agree, would you not, you don't know if Shylah actually went to the Sheriff?  You believe she did, but you don't know for a fact.
>
> A.      On that incident, I don't know for a fact if she did.  But I was told [by Tammy Thacker] that she had. . . .

(Kramer Dep. at 38-39, 44-46.)

Although there is evidence that Ms. Richins was harassed, no admissible evidence in the record supports Ms. Kramer's broad conclusion about the events involving Ms. Richins.  Ms. Kramer offers nothing more than speculation and inadmissible hearsay that, because of sexual harassment and Ms. Richins' purported report to the Sheriff, Ms. Richins quit because of a hostile work environment.  And there is no evidence that Sheriff Van Wagoner rewarded such harassment by promoting the harasser.

### Missing Money Investigation

Ms. Kramer also complained to Sheriff Van Wagoner about harassment she was receiving from Sergeant Benson during an investigation into missing court funds.  Ms. Kramer, Sergeant Benson and other courthouse employees were suspects in the investigation.  Sergeant Benson harassed Ms. Kramer about the missing money by repeatedly accusing her of taking the money.  When Ms. Kramer went to Sheriff Van Wagoner, she asked him if he could put her on leave "because I couldn't work in the environment that I was working in . . . .  And that's when the sheriff told me, 'This department is too small to do that.  You know that.  Did you take the

money?'  I said, 'No.'  He says, 'Well, then you have nothing to worry about.'" (Kramer Dep. at 92.)

## Harassment by Sergeant Benson

The heart of Ms. Kramer's sexual harassment claim focuses on four incidents.  The harassment by Sergeant Benson began soon after Ms. Kramer began working as a bailiff.  Sergeant Benson asked her to give him foot massages, and when she said no, he brought in a "doctor's note" on a prescription pad stating that "Camille is to rub Rick Benson's feet three times a day."  (Kramer Dep. at 63-65.)  Ms. Kramer posted the "prescription" on a bulletin board at work as a joke, but became increasingly uncomfortable as Sergeant Benson insisted that she actually follow through.  Sheriff Van Wagoner never saw the posted "prescription" and was never told about the incident.  (See Van Wagoner Dep. at 32.)

In March or April 2007, after Sergeant Benson's harassment of Ms. Kramer about the "prescription" escalated, Ms. Kramer said, out of frustration, "'If I give you a foot massage, will you just shut up about it?'  And he's like, 'Yeah.'  I go, 'Okay, great.'  He's like, 'Okay, come over after work and give me a foot massage.'  Okay.  So I went to his house after work." (Kramer Dep. at 67.)  During the foot massage, they "were talking and he was telling [her], you know, 'We're going to get you road experience when there's no court in session.'" (Id. at 69.) After she gave him a foot massage, she said "he grabbed my arm and he pulled me on top of him. And I believe he was going to kiss me.  And I pushed off and I'm like, 'What are you doing?' And he's like, 'Oh, you're right, I'm sorry.'  I was like, 'That was weird.'  And I didn't say anything to anybody."  (Id. at 68.)

After their conversation, Ms. Kramer expected that, when court was not in session, she

would go out in Sergeant Benson's patrol vehicle, serve warrants, and get road experience.  But back at work, she "felt like [she] was doing all this clerical work and [she] was doing the bailiff position and then Rick was taking Brad out . . . to serve these warrants that I was supposedly supposed to be serving instead."  (Id. at 70.)  When Sergeant Benson did not follow through, she asked Todd Bonner when she was allowed to go out on the road and he replied that she could go out anytime Sergeant Benson could take her out on the road.

The second incident occurred when Sergeant Benson took her out to get some road experience.  Sergeant Benson stopped at his house first and said he had to change uniforms. They talked about her possibly cleaning his house because she needed extra income.  He showed her around the house.  In the bedroom, he sat next to her on the edge of the bed, forcibly tried to undress her, groped her, and kissed her.  She told him to let her go.  He finally stopped and said "Just don't act weird.  Don't act weird on me."  (Kramer Dep. at 75.)  After they were back on the road, Sergeant Benson stopped the truck, got out, went to the bathroom on the side of the road, came back, opened her door and forcibly kissed her.  Again he said, "You can't act weird." (Id. at 76.)  Ms. Kramer told a friend about the incident but did not report it to anyone at work until July 2007.

After that, Ms. Kramer agreed to clean his house.  But then she became uncomfortable with the idea and came up with excuses to avoid going to his house.  Still, he pestered her to clean his house.  One day when he said he was going to be at his house with his children, she agreed to clean. She brought her children with her.

This was when the third incident occurred.  When the children were playing outside, he cornered her in the bedroom and raped her.  (See id. at 80-82.)  Then he said, "'You better not act

weird.  You better be quiet about this and not say anything.  This is a career ender.  And just be

quiet about it. Don't act weird."  (Id. at 82.)  Ms. Kramer did not immediately report this

incident.

The fourth incident occurred in July 2007 at Sergeant Benson's home when Ms. Kramer

visited him after he had foot surgery.  She said he asked her to bring a Coke to him at his house,

so she did after some pestering from Sergeant Benson and the other bailiff.  He asked her to

come into his room, where he exposed himself and grabbed her.  She pushed off of him, said

"no" and left.

Ms. Kramer contends that especially after the third incident, she suffered threats and

adverse job actions at the hands of Sergeant Benson.  According to Ms. Kramer, Sergeant Benson

took tangible employment action against her in a variety of ways.

First, she asserts that he threatened her with a poor job evaluation if she did not submit to

his sexual advances or if she told anyone about the incidents.  After the rape, Sergeant Benson

filled out a job evaluation form that was not favorable to Ms. Kramer.  But he did not submit that

evaluation to the Sheriff.  Instead, he showed Ms. Kramer the poor evaluation and then changed

it and submitted what the Sheriff characterized as a fairly good written evaluation.

Second, she asserts that Sergeant Benson withheld good work shifts and made it difficult,

if not impossible, to take time off to attend to personal business or go on vacation.  For example,

when she was not allowed to be in the courtroom because of the missing money investigation,

Sergeant Benson placed her at the magnetometer all day and did not schedule bathroom breaks

for her (although co-workers relieved her when she asked for assistance).  In her deposition, Ms.

Kramer explained that "because I was kept out of the justice courtroom [during the missing

money investigation] and Brad liked the district court, I was stuck at the mag." (Kramer Dep. at 97.)  In another example, after her original vacation request was approved, Sergeant Benson revoked approval, claiming that he needed her to work at the time she was scheduled to be out of the courthouse.  He also failed to relieve her from duty three different times despite knowing that she had requested time off for her son's surgery, a relative's funeral, and an aunt's swearing-in as a judge.

Third, she asserts that he threatened to fire her, that she believed he could, and that he stalked her in a manner that prevented her from reporting the harassment to personnel.  For example, before she took a polygraph as part of the missing money investigation, Sergeant Benson told her not to say anything about their sexual activities and threatened her, saying "if I go down, you go down."  (Id. at 98.)  Also, she testified that she was scared to report the conduct to human resources because of Sergeant Benson's "stalker-like attitude".[7]

> Q.    Okay. And where was the human resources office located when you were working at Wasatch County?
>
> A.    Down the street.  I don't know the exact address.
>
> Q.    Why couldn't you just drive over there and report Rick's sexual conduct?
>
> A.    Rick used to watch me leave work.  And if I went a different way, he would call and ask me where I was going.
>
> Q.    So you felt like he was always monitoring your actions.
>
> A.    I felt like he was always keeping tabs on me where I was at all times, who I was going with, what I was doing, why I was doing it.  It was more than just friendly like, "Hey, where are you going?"  It was more, "Where are you going?  You better not be going anywhere."

---

[7]Pl.'s Opp'n Mem. at xv.

(Id. at 155-56.)

**Wasatch County's Response to Allegations of Sergeant Benson's Sexual Harassment**

Ms. Kramer did not tell any person at work about these incidents until July 24, 2007, three days after she was in an automobile accident and had to take time off from work under the Family Medical Leave Act. When some of her co-workers visited her at home on July 24, 2007, she revealed Sergeant Benson's harassment, including the rape, to them. She never reported any of the incidents to Sheriff Van Wagoner, who said, "Camille Kramer didn't bring forward a sexual harassment complaint. . . . I had to find everything through either the court secretaries or through my own investigations, out of concern that there was some misconduct happening within the department." (Van Wagoner Dep. at 38.)

At the same time that Ms. Kramer revealed the sexual harassment by Sergeant Benson, her co-workers learned (and reported) that Ms. Kramer was pregnant with the child of a Wasatch County firefighter with whom she had consensual sexual relations while he was on duty.

Two internal investigations (one relating to the sexual harassment allegations and the other relating to alleged misconduct by Ms. Kramer and the County firefighter) and a criminal investigation were immediately launched. A number of interviews occurred within a couple of days from when Sheriff Van Wagoner received notice of the harassment allegations.

Sergeant Benson resigned soon after authorities carried out a search warrant obtained based on Ms. Kramer's allegations. After POST investigated Ms. Kramer's liaison with the County firefighter, it suspended her certification for a year. She did not fight the suspension despite her adamant contention in this case that she did nothing to warrant a suspension. Her co-worker and the Sheriff asked for her resignation, but she did not actually resign. She did,

20

however, turn in her gun, uniform, and badge.  She is no longer an employee at Wasatch County, but she was not terminated by the County or the Sheriff.  She said she could not return to her job duties because of the hostile work environment (essentially she alleges constructive discharge) and because injuries prevent her from carrying out her duties as a peace officer.

### ANALYSIS

#### Summary Judgment Standard

The court grants summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party."  Northern Nat. Gas Co. v. Nash Oil & Gas, Inc., 526 F.3d 626, 629 (10th Cir. 2008).  The court may only rely on evidence that would be admissible at trial.  Fed. R. Civ. P. 56(c)(1).  A party is entitled to summary judgment if no genuine dispute as to any material fact exists and no reasonable jury could find for the nonmoving party.  Pinkerton v. Colorado Dep't of Transp., 563 F.3d 1052, 1058 (10th Cir. 2009).

#### Title VII Claims Against Wasatch County

Under Title VII, an employer may not "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Ms. Kramer alleges *quid pro quo* and hostile work environment claims against Wasatch County for direct liability as well as vicarious liability for the actions of its former employee Rick Benson and Sheriff Van Wagoner.

*Quid pro quo* harassment occurs when a supervisor carries out a threat to deny tangible job benefits based on the employee's failure to submit to the supervisor's sexual advances.

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 752 (1998). Liability for a "hostile work environment" exists when no explicit or constructive alterations in the terms or conditions of employment (i.e., "tangible employment actions") occur but the sexual harassment was so severe or pervasive that it created an abusive working environment. Id.; Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998); Pinkerton v. Colorado Dep't of Transp., 563 F.3d 1052, 1058 (10th Cir. 2009). The primary distinction between these categories is whether the employee suffered a "tangible employment action." See Ellerth, 524 U.S. at 751-52. An employer may be directly or vicariously liable under either of the two theories.

Ms. Kramer contends that Wasatch County is directly and vicariously liable because (a) she was sexually harassed by Sergeant Rick Benson, who acted as her supervisor or an agent of Wasatch County, and who subjected her to tangible adverse employment actions; and (b) Wasatch County, through the actions of its agent Sheriff Van Wagoner, negligently responded to the harassment and Ms. Kramer's complaints.

From the record it appears that the Defendants concede for the limited purpose of summary judgment analysis that Rick Benson's behavior amounted to actionable sexual harassment. But Defendants dispute Ms. Kramer's assertions that Rick Benson was her supervisor, that she suffered a tangible employment action, that Wasatch County knew or should have known about the harassment but did not take appropriate action, and that Wasatch County is vicariously liable for the actions of Rick Benson and Sheriff Van Wagoner in creating or perpetuating a hostile work environment.

22

**Supervisor**

Ms. Kramer alleges that Rick Benson was her supervisor because he had sufficient control over the terms and conditions of her job. Nothing in the record shows that Sergeant Benson had any authority to actually affect the material terms and conditions of her employment. Only the Sheriff had that authority.

In the alternative, she alleges that Wasatch County is liable because Rick Benson acted with apparent authority. See Wright-Simmons v. City of Oklahoma City, 155 F.3d 1264, 1269-70 (10th Cir. 1998) (noting apparent authority under agency law as basis for holding an employer liable under Title VII). In limited circumstances, an employer may be directly liable under the "apparent authority" rule, which requires evidence that the victim has "a false impression that the actor was a supervisor, when he in fact was not, [and that] the victim's mistaken conclusion" was a "reasonable one." Ellerth, 524 U.S. at 759.

No reasonable jury could find that Ms. Kramer's belief that Sergeant Benson had de facto firing powers was reasonable. She knew that Sheriff Van Wagoner was the department head. She knew about the Wasatch County Personnel Policy (she referred to it when she complained to Sheriff Van Wagoner about Sergeant Benson's harassment during the missing money investigation). That policy expressly states that the "department head/elected official" may discipline, demote, and dismiss an employee. (See Wasatch County Personnel Policy at Section XIII (attached as Ex. D to Defs.' Mem. Supp. Mot. Summ. J.).) Her understanding that Sergeant Benson had the opportunity to give negative feedback and recommendations to the Sheriff does not reasonably translate into an understanding that he had the ability to materially affect the conditions of her employment. Indeed, when Ms. Kramer did complain about job conditions, she

23

went to Sheriff Van Wagoner, not Sergeant Benson.

For the foregoing reasons, the court holds that Sergeant Benson was not a supervisor under Title VII.

### Tangible Employment Action

Even assuming Sergeant Benson was a supervisor under Title VII, no tangible employment actions were taken against Ms. Kramer by Sergeant Benson.

The United States Supreme Court defines "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, re-assignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 751.  "Tangible employment actions fall within the special province of the supervisor" and "require[] an official act of the enterprise, a company act." Id. at 762.  The tangible employment action must have been taken by the harassing supervisor.  Harrison v. Eddy Potash, 248 F.3d 1014, 1024 (10th Cir. 2001).

The conditions Ms. Kramer experienced under Sergeant Benson's supervision were not tangible employment actions.  Sergeant Benson made threats to fire Ms. Kramer, but Ms. Kramer was not actually demoted and did not lose her job because of any action by Sergeant Benson.  He may have threatened, but he did not carry out that threat to evaluate her poorly (his written evaluation of her performance was actually favorable) or recommend firing or demotion to the Sheriff.  Sergeant Benson interfered with her time off and unfairly delegated job duties, but those actions are not substantial enough to qualify as a significant change in benefits.  Ms. Kramer did not suffer economic injury as a result of Sergeant Benson's discriminatory actions.  See Ellerth, 524 U.S. at 760; Sauers v. Salt Lake County, 1 F.3d 1122, 1127 (10th Cir. 1993) (holding that

24

job transfer was not quid pro quo harassment); <u>Watts v. Kroger Co.</u>, 170 F.3d 505, 510 (5th Cir. 1999) (holding that change in work schedule and assigning less desirable job duties did not constitute a tangible employment action).  As frustrating as Sergeant Benson's actions may have been to Ms. Kramer, the actions did not result in a significant change in benefits.

      To the extent Ms. Kramer alleges that she was constructively discharged, such a claim fails as well.  Ms. Kramer was never terminated from her job by Wasatch County.  She was not on the job at the time the harassment was finally reported, because she was injured in the automobile accident.  And her POST suspension was not related to Sergeant Benson's harassment.

      But even assuming she suffered a "constructive discharge," it was not due to the harassing behavior of Sergeant Benson.  It was due to the accident and her consensual relationship with the County firefighter.  "[A] plaintiff cannot show that a supervisor's harassment 'culminated' in a tangible employment action merely by demonstrating that the tangible employment action followed the harassment.  Rather, the plaintiff must establish a <u>strong causal nexus</u> between the supervisor's harassment and the tangible employment action." <u>Helm v. Kansas</u>, 656 F.3d 1277, 1287 (10th Cir. 2011) (emphasis added).  No evidence of a "strong causal nexus" exists in the record.

      Because Ms. Kramer did not suffer a tangible employment action, Wasatch County is not strictly liable for Sergeant Benson's actions.

**Alleged Negligence**

      Ms. Kramer alleges that Wasatch County is directly liable under Title VII because Sheriff

Van Wagoner, as Wasatch County's agent,[8] knew or should have known about the harassment but failed to stop it, and, through that failure, perpetuated the hostile work environment.  See Harrison v. Eddy Potash, Inc., 158 F.3d 1371, 1374-75 (10th Cir. 1998) (an employer may be directly liable under Title VII for a supervisor's sexual harassment "where the employer knew or should have known about the harassment but failed to stop it."). The record does not support her conclusion.

Sheriff Van Wagoner did not know (nor could he have known, based on the admissible record before the court) about Sergeant Benson's sexual harassment of Ms. Kramer.  Ms. Kramer did not report any of Sergeant Benson's sexual harassment to Sheriff Van Wagoner or any co-worker until July 2007.  Sergeant Benson's sexual advances all occurred outside the courthouse, and Sheriff Van Wagoner testified that he never saw Sergeant Benson engage in sexually harassing behavior.  Although Ms. Kramer did report harassment by jealous co-workers in the jail and harassment by Sergeant Benson during the missing money investigation, there was nothing to indicate that those incidents of harassment were sexual in nature or based on gender. Sheriff Van Wagoner took steps to stop sexual harassment when he was informed about it (e.g., the "babe of the day" screen saver, the pornography incident, and sexual comments made by male jail employees).  And, despite Ms. Kramer's contention to the contrary, no evidence

---

[8]The actions of Sheriff Van Wagoner are imputed to Wasatch County because it is undisputed that the Sheriff was acting as the County's agent.  See 42 U.S.C. § 2000e(b) (defining "employer" to include "agents"); Ellerth, 524 U.S. at 754 (noting that the issue of who is liable under Title VII must be analyzed using common law principles of agency and that "indirect liability" may exist "where the agent's high rank in the company makes him or her the employer's alter ego."); Faragher, 524 U.S. at 789-90 (a "sufficiently high position in the management hierarchy of the company" can automatically impute the individual's actions to the employer).

supports the assertion that Sergeant Benson had a history of sexual harassment, much less that the Sheriff knew of any such alleged history. Indeed, much of what Ms. Kramer relies on to defend against the summary judgment motion is speculation and inadmissible hearsay.

No reasonable jury could find that Wasatch County knew or should have known about Sergeant Benson's sexual harassment of Ms. Kramer. Accordingly, it has no direct liability under Title VII and is entitled to summary judgment on that claim.

**Vicarious Liability and the <u>Ellerth/Faragher</u> Defense**

An employer may be held vicarious liable "for actionable sexual harassment perpetrated by a supervisor with immediate (or successively higher) authority over the victimized employee in two situations." <u>Helm</u>, 656 F.3d at 1285.

The first situation is when the supervisor's sexual harassment culminates in an adverse tangible employment action. <u>Id.</u> (citing <u>Faragher</u>, 524 U.S. at 808). In that situation, the employer does not have any affirmative defense to vicarious liability. <u>Pinkerton v. Colorado Dep't of Transp.</u>, 563 F.3d 1052, 1059 (10th 2009) (citing <u>Ellerth</u>, 524 U.S. at 765).

In the second situation, where no tangible adverse employment action occurred, the employer is liable for a severe and pervasive hostile work environment unless it can prove by a preponderance of the evidence that "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." <u>Helm</u>, 656 F.3d at 1285. This is known as the

*Ellerth/Faragher* affirmative defense.[9]

Because, as the court has already held, no tangible employment action culminated from the harassment, Wasatch County may assert the affirmative defense.

<u>Whether Wasatch County Exercised Reasonable Care to Prevent and Correct Sexual Harassment</u>

The first element of the defense requires the employer to show that it exercised reasonable care to prevent sexual harassment and that it exercised reasonable care to correct promptly any sexual harassment that occurred.  <u>Helm</u>, 656 F.3d at 1288.

*Prevention*

"[T]he existence of a valid sexual harassment policy is an important consideration in determining whether an employer acted reasonably to prevent sexual harassment."  <u>Id.</u> at 1288. The fact that an employer conducted sexual harassment training also supports the conclusion that the employer exercised reasonable care to prevent sexual harassment.  <u>See, e.g.</u>, <u>id.</u> at 1288-89; <u>Pinkerton</u>, 563 F.3d at 1062.

The Sheriff's Department, through Wasatch County, had a sexual harassment policy in place.  Ms. Kramer knew about the policy.  The Sheriff's Department also conducted training at least once a year.  That is sufficient to establish an effort the prevent sexual harassment.  <u>See</u> <u>Helm</u>, 656 F.3d at 1288-89; <u>Pinkerton</u>, 563 F.3d at 1062.

*Prompt Action*

Proper notice of a sexual harassment claim triggers the duty to take prompt corrective

---

[9]The <u>Ellerth/Faragher</u> defense arises out of a pair of decisions issued by the United States Supreme Court in 1998:  <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998), and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 808 (1998).

action.  Helm 656 F.3d at 1290-91.  "'The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified.'"  Helm, 656 F.3d at 1290 (quoting Swenson v. Potter, 271 F.3d 1184, 1192 (9th Cir. 2001)).

Overall, the Sheriff exercised reasonable care to promptly correct any sexual harassment of which he became aware.  The record shows that whenever the Sheriff was actually informed about such type of behavior, he took immediate action.

Ms. Kramer points to the Sheriff's re-enactment of harassment during the 2006 staff meeting as an example of unreasonable action that simply perpetuated the hostile work environment.  Although that meeting was inartfully conducted by Sheriff Van Wagoner, it nevertheless was an attempt to promptly remediate the reported sexual harassment.  It does not establish that the County failed to exercise reasonable care to remedy sexual harassment in the workplace.

<u>Whether Ms. Kramer Unreasonably Failed to Take Advantage of Preventive or Corrective Opportunities or to Avoid Harm Otherwise</u>

Ms. Kramer does not dispute that she voluntarily went to Sergeant Benson's house more than once, even after the harassment began (including the time after the rape when she went to his house to deliver a Coke to him when he asked).  There is no evidence that she was compelled to do so.  She could have avoided some of the encounters.

Ms. Kramer did not report any of Sergeant Benson's sexual harassment to the Sheriff at a time when he could have taken corrective action to prevent escalation of the harassment.  Yet she was fully aware of the procedures for reporting harassment.  She had followed them in the past.

She blames her failure to report Sergeant Benson's sexual harassment on her fear of retaliation by Sergeant Benson and her belief that reporting to the Sheriff would have been futile. But much of her belief about the futility of reporting is based on speculation and a patchwork of unrelated and exaggerated events.  And, as noted above, Ms. Kramer's belief that Sergeant Benson had the authority to materially affect the terms and conditions of her job was not reasonable.  Furthermore, her purported fear of Sergeant Benson is difficult to understand when she continued to interact with him at times when she was not required to do so.  The nature of his "stalker-like" behavior does not support the conclusion that it prevented her from driving down the road in her car to the human resources department to report the serious allegations she raises now.  As the Tenth Circuit noted:

> [M]any of our sister circuits have stated that a generalized fear of retaliation simply is not sufficient to explain a long delay in reporting sexual harassment. The rationale behind Title VII compels us to agree.  The primary objective of Title VII is not to provide redress but to avoid harm.  To promote this objective of avoiding harm, Title VII in general, and the Ellerth/Faragher defense in particular, is premised on a cooperative framework wherein the employee reports sexual harassment and the employer remedies the improper conduct. . . . It is undeniable that raising problems regarding sexual harassment can be uncomfortable for the employee, but if we were to allow an employee's subjective, ungrounded fears of unpleasantness or retaliation to alleviate an employee's reporting requirement, we would completely undermine Title VII's basic policy of encouraging forethought by employers and saving action by objecting employees.

Pinkerton, 563 F.3d at 1063 (internal citations and quotation marks omitted).

For the foregoing reasons, the court holds that Ms. Kramer unreasonably failed to take advantage of the remedies offered by Wasatch County.  Accordingly, Wasatch County is entitled to summary judgment based on the Ellerth/Faragher affirmative defense.

**Section 1983 Claim Against Wasatch County and Sheriff Van Wagoner**

Ms. Kramer alleges that Wasatch County and Sheriff Van Wagoner are liable under 42

U.S.C. § 1983 for violation of her equal protection rights under the Fourteenth Amendment.[10]

Sexual harassment under color of state law is actionable under § 1983 and the Fourteenth

Amendment.  See Woodward v. City of Worland, 977 F.2d 1392, 1398 (10th Cir. 1992) (citing

Starrett v. Wadley, 876 F.2d 808 (10th Cir. 1989)).  Under certain circumstances, sexual

harassment by a third-party (Sergeant Benson in this case) can subject a supervisor or

governmental entity to liability for violation of the Equal Protection Clause.  To establish such

liability, Ms. Kramer must show that the Sheriff and Wasatch County had knowledge of the

harassment but deliberately failed to take adequate steps to stop it.

Sheriff Van Wagoner contends that claims against him should be dismissed because he is

entitled to qualified immunity.  Wasatch County, in its defense, contends that Ms. Kramer has

not presented evidence that the County had a custom, practice or policy that encouraged or

facilitated sexual harassment.

**Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800,

818 (1982).  "Once a defendant raises the defense of qualified immunity as a defense to an

action, '[t]he plaintiff carries the burden of convincing the court that the law was clearly

---

[10]Originally Ms. Kramer alleged violation of her First Amendment rights as well.  She has since withdrawn those claims.

established.'"  Powell v. Mikulecky, 891 F.2d 1454, 1457 (10th Cir. 1989) (quoting Pueblo

Neighborhood Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 645 (10th Cir. 1988)).  The plaintiff

must "come forward with facts or allegations sufficient to show both that the defendant's alleged

conduct violated the law and that the law was clearly established when the alleged violation

occurred."  Pueblo Neighborhood, 847 F.2d at 645.

 Here, the parties do not dispute that the right to be free from sexual harassment is a

clearly established right in the Tenth Circuit.  And the parties do not dispute that Sergeant

Benson violated that right.  Instead, Ms. Kramer alleges that the Sheriff, as a supervisor, was

deliberately indifferent to the sexual harassment Ms. Kramer suffered from co-workers, and,

especially, Sergeant Benson.  Specifically, she contends that he violated her rights by failing to

train, failing to supervise, placing Ms. Kramer under Sergeant Benson's supervision despite

alleged knowledge of Sergeant Benson's "history," and maintaining a workplace where sexual

harassment was "rampant."  (See Pl.'s Supplemental Reply Br. Regarding Qualified Immunity

(Docket No. 77) at 5.)  But the purported evidence upon which she relies simply does not exist.

 "To establish supervisor liability under § 1983, it is not enough for a plaintiff merely to

show a defendant was in charge of other state actors who actually committed the violation.

Instead . . . the plaintiff must establish a deliberate, intentional act by the supervisor to violate

constitutional rights."  Serna v. Colo. Dep't of Corrections, 455 F.3d 1146, 1151 (10th Cir. 2006)

(internal citations and quotation marks omitted).  Ms. Kramer must provide evidence that

discrimination based on gender "was a motivating factor."  Watson, 857 F.2d at 694.  And Ms.

Kramer must present evidence of an "'affirmative link' between the supervisor and the violation,

namely the active participation or acquiescence of the supervisor in the constitutional violation

by the subordinates." Id. A plaintiff may establish an "affirmative link" by evidence of the
"'supervisor's personal participation, his exercise of control or direction, or his failure to
supervise.'" Id. (quoting Holland v. Harrington, 268 F.3d 1179, 1187 (10th Cir. 2001)).

Sheriff Van Wagoner is only liable under § 1983 for the unconstitutional acts of his
deputies if the evidence shows that he knew about the sexual harassment but consciously failed
to stop it. See Woodward, 977 F.2d at 1398-99; see also Serna, 455 F.3d at 1151 ("the
supervisor's state of mind is a critical bridge between the conduct of a subordinate and his own
behavior."). "[I]f a plaintiff merely shows that a supervisor 'should have known' that a
subordinate was violating someone's constitutional rights and it is not established that the
supervisor actually had such knowledge, the plaintiff will not have established a deliberate,
intentional act by the supervisor to violate constitutional rights. . . . The Supreme Court has
made it clear that liability under § 1983 must be predicated upon a 'deliberate' deprivation of
constitutional rights by the defendant." Woodward, 977 F.2d at 1399 (emphasis in original).
Actual knowledge may be proven by circumstantial evidence. Id. at 1399 n.10. Although
negligence is not actionable under § 1983, recklessness falls within the definition of "deliberate"
to the extent that the supervisor took a "conscious acceptance of a known, serious risk." Id. at
1399 n.11. But recklessness "requires proof that the defendant focused upon the risk of
unconstitutional conduct and deliberately assumed or acquiesced in such risk." Id.

Ms. Kramer has not presented evidence from which a reasonable jury could conclude that
Sheriff Van Wagoner was deliberately indifferent to the sexual harassment of Sergeant Benson.
"Deliberate indifference requires that the official 'both be aware of facts from which the
inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

33

inference.'" <u>Serna</u>, 455 F.3d at 1154-55 (quoting <u>Verdecia v. Adams</u>, 327 F.3d 1171, 1175 (10th Cir. 2003)).  Here, there is no admissible evidence that Sheriff Van Wagoner knew anything about Sergeant Benson's activities.  And despite Ms. Kramer's emphasis on the alleged "history" of Sergeant Benson, there is no admissible evidence that Sergeant Benson had a history of sexual harassment, much less that Sheriff Van Wagoner had knowledge of it.

Nothing in the admissible record would have provided notice to the Sheriff about Sergeant Benson's actions or alleged proclivities before he heard from Rae Davis that Sergeant Benson sexually assaulted Ms. Kramer.  When he did have knowledge of the sexual harassment, he took immediate action by starting an investigation.  Soon thereafter, Sergeant Benson resigned and the source of Ms. Kramer's harassment was removed.

Particularly given the absence of admissible evidence in the record, no reasonable jury could find that Sheriff Van Wagoner had any discriminatory intent, and Sheriff Van Wagoner is entitled to qualified immunity.

**Alleged Custom, Practice, or Policy**

Wasatch County may only be liable under § 1983 if it had a custom, practice, or policy that condoned sexual harassment in the workplace.  <u>See</u> <u>Monell v. Dep't of Social Servs. of the City of New York</u>, 436 U.S. 658, 691, 694 (1978) (holding that a municipality may not be held liable under Section 1983 under a theory of respondeat superior but may be liable for policies or customs that violate an employee's constitutional rights).  The custom, practice, or policy must be "standard operating procedure of the local governmental entity." <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 736 (1989) (internal quotation marks and citation omitted).

First, the court notes that Wasatch County adopted a policy against sexual harassment in

the workplace.  The policy established a procedure with different options for making a complaint about sexual harassment.  The County conducted annual training on sexual harassment prevention for its supervisory and non-supervisory employees.  This is inconsistent with a finding that the County had a policy condoning such behavior.  Second, and most significantly, Sheriff Van Wagoner's actions[11] do not demonstrate that he tolerated, fostered, or created a hostile work environment at the court house or in the jail.

Ms. Kramer contends that nothing happened when she or other employees complained to the Sheriff.  To the contrary, the evidence shows that as soon as the Sheriff had a complaint,  he took action to stop the behavior.

For example, a few years earlier, Sheriff terminated two different employees who engaged in sexually discriminatory behavior.  One was fired for viewing pornography on a County computer and another for sexually harassing a female inmate.

Also, when Rae Davis, Shylah Richins, and Ms. Kramer complained about the "babe of the day" screen saver, Chief Deputy Todd Bonner, acting as the Sheriff's second-in-command, told the employees who displayed the screen saver that it was offensive to some employees and that they needed to remove the screen saver immediately.  (See Bonner Dep. at 12.)  Chief Deputy Bonner gave a verbal warning and the behavior stopped.  Sheriff Van Wagoner also received the complaint about the "babe of the day" screen saver.  He said the two employees involved were both disciplined.  He also conducted a staff meeting a few days later to review with employees the County's policy against sexual harassment in the workplace.

--------

[11]Sheriff Van Wagoner, as head of the department, was a policy maker for Wasatch County.

The 2006 staff meeting where Sheriff Van Wagoner apparently re-enacted harassment recently report by Ms. Kramer, while poorly handled, does not indicate a discriminatory intent. The record shows that the purpose of the meeting was not to intimidate or perpetuate the hostile work environment but to fix the situation of which Ms. Kramer complained.

Finally, the undisputed evidence shows that Ms. Kramer never complained directly to Sheriff Van Wagoner about Sergeant Benson's sexual advances. She understood that she could take sexual harassment complaints to the Sheriff or to other individuals or entities outside the Sheriff's department. But she did not. And the Sheriff was not put on notice of a potential risk because Sergeant Benson did not have any known history of sexually harassing behavior. When Sheriff Van Wagoner actually received a complaint about Sergeant Benson, he immediately began an investigation which led to Sergeant Benson's resignation.

The record does not support Ms. Kramer's assertions that Sheriff Van Wagoner tolerated sexually harassing conduct, was aware of Sergeant Benson's conduct, or ran the department in such a way that sexual harassment was standard operating procedure. Accordingly, Ms. Kramer has not met her burden and Wasatch County is entitled to summary judgment on Ms. Kramer's § 1983 claim.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.    The court's March 31, 2011 Order and Memorandum Decision (Docket No. 59) is VACATED.

2.    Defendant Wasatch County and Defendant Sheriff Van Wagoner's Motion for

Summary Judgment (Docket No. 45) is GRANTED.  The Clerk of the Court is directed to close this case.

SO ORDERED this 9th day of March, 2012.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge